# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                        Plaintiff,

v.                                                    Case No. 25-CR-95-JPS

WALTER C. JOHNSON,

                        Defendant.                    **ORDER**

## 1.    INTRODUCTION

On May 20, 2025, Defendant Walter C. Johnson ("Johnson") was indicted on charges of possessing firearms as a convicted felon, possessing controlled substances with the intent to distribute, and possessing firearms in furtherance of that drug trafficking offense. ECF No. 1. On August 1, 2025, Johnson filed a motion to suppress evidence, ECF No. 11, which he amended ten days later, ECF No. 12, to account for the emergence of the parties' stipulated facts, ECF No. 14; *see also* ECF No. 13 (letter from counsel indicating that the stipulation was the reason for the amended motion).

On October 2, 2025, Magistrate Judge Stephen C. Dries issued a report and recommendation (the "R&R"), recommending that this Court deny Johnson's amended suppression motion. ECF No. 22. Johnson objected to the R&R, ECF No. 24, and the Government responded to the objection, ECF No. 25, and Johnson replied, ECF No. 27. For the reasons explained below, the Court will overrule Johnson's objections, adopt the R&R, albeit on different grounds, and deny Johnson's suppression motion, ECF No. 11, and Johnson's amended motion, ECF No. 12.

## 2.    STANDARD OF REVIEW

When reviewing a magistrate judge's R&R, the Court is obliged to analyze de novo "those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* The Court's review encompasses both the magistrate judge's legal analysis and factual findings. *See id.*; *see also* FED. R. CRIM. P. 59(b)(2). "Portions of a recommendation to which no party objects are reviewed for clear error." *United States v. Musgrove*, 845 F. Supp. 2d 932, 937 (E.D. Wis. 2011) (citing *Johnson v. Zema Sys. Corp.*, 170 F.2d 734, 739 (7th Cir. 1999)).

## 3.    RELEVANT FACTS

In his R&R, Magistrate Judge Dries carefully described all the facts material to Johnson's motion. ECF No. 22 at 1–4. Notably, prior to the R&R, the parties stipulated to certain facts, ECF No. 14, which Magistrate Judge Dries turned to in developing the factual background of his R&R, *see generally* ECF No. 22. While Johnson may point to "additional details" to make his arguments, he does not object to the R&R's factual recitation. ECF No. 24 at 2 ("Johnson does not object to the Magistrate's factual background. Report at 1–4."). The Court has no independent reason to disagree with the facts as Magistrate Judge Dries found them. The Court will, therefore, adopt the facts as stated in the R&R, reproducing them here.[1]

_____

[1] To the extent Johnson points to "additional details" or disputes the Government's characterization of certain facts, the Court will address those in a series of footnotes, *see infra* notes 2, 6, 8, 9, 10, and 12. As will be made clear later, Johnson does not dispute Magistrate Judge Dries' factual recitation, nor the parties' stipulated facts, but merely seeks to challenge some of the characterizations of the facts by the Government and add facts "as necessary." ECF No. 24 at 2; ECF No. 27 at 2–4.

Case 2:25-cr-00095-JPS    Filed 01/07/26    Page 2 of 30    Document 28

On January 27, 2025, around 11:30 a.m., Defendant was "hanging out" in front of a convenience store owned in Milwaukee, Wisconsin, wearing a "blue winter jacket, jeans, and glasses." ECF No. 22. at 2 (citing ECF No. 14 at 2). The owner of that store, RS, exited the store, confronted Johnson and shoved Johnson off the stoop. *Id*. (citing ECF No. 12 at 3). Johnson threatened RS and SS. *Id*. (citing ECF No. 12 at 3; ECF No. 14 at 2; and ECF No. 16 at 1). Johnson pulled an item out of his pocket and held it at his side. *Id*. at 2 (citing ECF No. 16-1).[2] RS and his son, SS, believed that the item was a gun.[3] *Id*. (citing ECF No. 16 at 2–3). RS and SS backed up as Johnson walked away. *Id*. (citing ECF No. 16 at 2–3 and ECF No. 14 at 2). SS called 911 while RS drove his vehicle to follow Johnson. *Id*. (citing ECF No. 14 at 2). On the 911 call, SS gave details about the incident and his location. *Id*. (citing same).[4]

In response to the call, Milwaukee Police Officers Gonzales and Hayes[5] arrived around 11:51 a.m. and spoke with SS outside the store. *Id*. (citing ECF No. 14 at 2–3). SS told those officers that a man in a blue jacket appeared to be selling marijuana and pulled out a gun "to threaten us and

---

[2]In the reply brief, Johnson disputes the Government's contention in its opposition brief that the item he pulled out was a pistol. ECF No. 27 at 2. Johnson, however, does not dispute the facts as laid out by Magistrate Judge Dries. *See generally id*. Accordingly, the Court will adopt Magistrate Judge Dries' factual recitation that Johnson took out an "item" from his pocket and held it at his side. ECF No. 22 at 2 (citing ECF No. 16-1).

[3]While Defendant disputes whether the item was a gun, ECF No. 27 at 2, Defendant does not dispute that RS and SS believed it was a gun. *See generally* ECF Nos. 24 and 27.

[4]The parties specifically agree that SS called the police and reported that a man in a blue jacket had just pointed a gun at SS and was walking away. ECF No. 14 at 2.

[5]Both officers had body worn cameras. ECF No. 14 at 2.

said you guys are gonna die." *Id*. (citing Exhibit 2A, Officer Gonzales' body camera footage). SS showed officers the surveillance video on his phone. *Id*. (citing ECF No. 14 at 2–3).[6] As the officers drove off, they noted that they saw no gun but that the camera angle was not good. *Id*. (citing ECF No. 12 at 2); *see also* ECF No. 25 at 4. The officers then located RS—who was following the man, ECF No. 14 at 3—and spoke with him for approximately thirty seconds. ECF No. 22 at 2 (citing ECF No. 12 at 3); *see also* ECF No. 25 at 4. RS also reported that the man pulled out a gun and pointed to where the man who did so was heading. ECF No. 22 at 2 (citing ECF No. 14 at 3).[7]

The officers quickly located Johnson, who was wearing a blue jacket. *Id*. (citing ECF No. 14 at 3). Around 11:55 a.m., they pulled the squad car over and asked Johnson to stop, which he did. *Id*. at 2–3 (citing Exhibit 2B, Officer Gonzales' body camera footage and Exhibit 3A, Officer Hayes' body camera footage); *see also* ECF No. 25 at 4. Johnson said there was "talking shit" but denied making any threats. ECF No. 22 at 3 (citing ECF No. 14 at

---

[6]Johnson makes two disputes to the Government's characterization of the facts here. First, as Johnson correctly points out, ECF No. 27 at 2, neither Magistrate Judge Dries nor the parties adopted the view that the item Johnson pulled out of his pocket was a gun. *See generally* ECF Nos. 14 and 22. Second, Johnson disputes whether, as the Government contends, the officers' conversation with SS or their "30 second view of the store surveillance video" corroborated SS's "claims [on the 911 call] of being threatened by a gun-brandishing man who was selling drugs near their store." ECF No. 27 at 4. According to Johnson, "Magistrate Judge Dries rightly found that the officers 'noted that they saw no gun in the video.'" *Id*. (citing ECF No. 22 at 2). True, the parties did not agree that it was a gun in the video. As to the remaining details, however, the Court returns to the stipulated facts, which recite that "[w]hen the officers pulled up to the store, they were approached by S.S., who described the incident and said that his dad was following the man who had threatened them with a gun. S.S. told the officers he had it on video and showed the officers a video on his phone." ECF No. 14 at 3.

[7]RS also indicated the man was wearing a blue jacket. ECF No. 14 at 3.

3 and Exhibit 3A, Officer Hayes' body camera footage). At around 11:56 a.m., the officers frisked Johnson's clothing[8] for about forty seconds[9] but did not find a firearm. *Id.* (citing ECF No. 14 at 3). The officers continued to ask Johnson questions such as his name and address. ECF No. 14 at 2. The Court will assume, without deciding, that, at the time he was stopped, Johnson was, as he represents, headed home to the address he provided, which was only a block away. ECF No. 27 at 4 (citing Exhibit 3A, Officer Hayes' body camera footage).

Around 11:58 a.m., Officer Hayes frisked Johnson again[10] before putting him in the back of the squad car[11] and again did not find a firearm. *Id.* (citing same). While Johnson remained unhandcuffed in the back of the

---

[8]Johnson disputes the Government's characterization of Johnson's clothing as a "bulky winter jacket" to the extent that it depicted "Johnson's winter garb as something of a wearable redoubt in order to justify the second search." ECF No. 27 at 2. In making this argument, the Court is not clear whether Johnson disputes the jacket's characterization as bulky or whether he disputes that a bulky jacket can give rise to a justification for a second pat-down. To the extent he disputes the jacket's characterization as bulky, the Court will refrain from viewing the jacket as "bulky," but it will view it as "winter garb" as Johnson himself suggests. ECF No. 27 at 2.

[9]Johnson claims the first frisk was forty-five seconds, ECF No. 24 at 4 (citing Exhibit 3A, Officer Hayes' body camera footage), but the video timestamps he cites span from 11:56:45 mark to the 11:57:25 mark, meaning that it took only forty seconds. The Government suggests that the first frisk lasted about thirty-five seconds. ECF No. 25 at 14 (citing Exhibit 2B, Officer Gonzales' body camera footage and Exhibit 3A, Officer Hayes' body camera footage).

[10] Johnson contends that this second *Terry* Frisk took approximately seven seconds. ECF No. 12 at 6. The Government contends it took about eight seconds. ECF No. 16 at 11.

[11] Johnson was not handcuffed during this time. ECF No. 14 at 3.

Case 2:25-cr-00095-JPS    Filed 01/07/26    Page 5 of 30    Document 28

squad car, Officer Hayes conducted a background check.[12] *Id.* (citing same). Around noon, another squad car arrived with two more officers and Officer Gonzales brought Johnson out of the squad car to sit on the curb with those backup officers. *Id.* (citing same). Johnson, therefore, was in the back of the squad car for approximately two minutes. *Id.* (citing same).

Around 12:02 p.m., Officers Gonzales and Hayes spoke with RS, who was waiting in his car nearby. *Id.* (citing same). RS reported that Johnson had been selling drugs every day in front of his store. *Id.* (citing ECF No. 15 (Exhibit 2C, Officer Gonzales' body camera footage)). RS told officers that when he asked Johnson to move Johnson pointed a gun at RS[13] and threatened to kill him. *Id.* (citing Exhibit 2C, Officer Gonzales' body camera footage, and ECF No. 14 at 3).

Around 12:09 p.m., Officers Gonzales and Hayes returned to where Johnson sat on the curb, informed him that he was under arrest, and handcuffed him. *Id.* (citing ECF No. 14 at 3). They searched him and located a loaded Ruger EC9S pistol and bags of substances that tested positive for cocaine, marijuana, and methamphetamine, in addition to cash and phones. *Id.* (citing ECF No. 14 at 3–4). Approximately fifteen minutes passed between when the officers first made contact with Johnson around 11:55 a.m. and his arrest around 12:09 p.m. *Id.* (citing same).

---

[12]The background check revealed he had felony conviction, but it did not show any active warrants. ECF No. 14 at 3. Johnson disputes the Government's suggestion that police officers were aware at the time of "stop, frisks, continued detention, and then the arrest" that he was on "any form of supervision." ECF No. 27 at 3; ECF No. 25 at 5 n. 5. The Court will assume, without deciding, that the officers were not so aware in rendering its decision here.

[13]RS at that point also physically demonstrated for the officers the way in which the alleged gun was drawn. ECF No. 14 at 3.

## 4.    ANALYSIS

Johnson's amended motion to suppress contends that the officers' actions violated the Fourth Amendment and he, therefore, seeks to suppress the fruits of those violations. *See generally* ECF No. 12.

Magistrate Judge Dries found no merit to any of the arguments. ECF No. 22 at 4–11. First, he determined that there was reasonable suspicion for the initial investigatory stop (or *Terry* stop, named after *Terry v. Ohio*, 392 U.S. 1 (1968)). *Id*. at 4–5. He then concluded the *Terry* frisks were lawful because the officers had a reasonable belief Johnson was armed and dangerous. *Id*. at 5–7. Third, he determined that Johnson's time in the back of the squad car prior to the backup officers' arrival and then sitting on the curb amounted to a detention, not an arrest. *Id*. at 7–9. Finally, he found that there was probable cause for the undisputed arrest at 12:09 p.m. *Id*. at 9–11.

In his objections, Johnson argues that there was not reasonable suspicion to conduct the stop and frisks. ECF No. 24 at 2–5. Johnson further argues that what Magistrate Judge Dries considered a detention was actually an arrest for which there was no probable cause. *Id*. at 6–7.

In response, the Government argues that the officers had reasonable suspicion to conduct the *Terry* stop. ECF No. 25 at 9–12. The Government also argues that the officers had reasonable suspicion to conduct both *Terry* frisks. *Id*. at 12–14. The Government further contends that Johnson's time in the squad car and on the curb amounted to a detention, not an arrest, which was reasonably related in scope and duration to the 911 call and statements from SS and RS. *Id*. at 14–15. The Government lastly argues that, even if it did amount to an arrest, there was probable cause. *Id*. at 15–17.

The Court addresses each of Johnson's objections in turn.

## 4.1 *Terry* Stop

### 4.1.1 Magistrate Judge Dries' Findings as to Terry Stop

Magistrate Judge Dries found that Officers Gonzales and Hayes had reasonable suspicion to initiate the investigatory stop, which the parties agree started when Officer Gonzales frisked Johnson. ECF No. 22 at 4 (citing ECF No. 12 at 9 and ECF No. 16 at 8). Magistrate Judge Dries explained that *Terry* stops "are investigatory stops limited in scope and executed through the least restrictive means reasonable." *Id*. (quoting *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)). He noted that probable cause is not the standard but rather whether the officers had "reasonable suspicion supported by articulable facts that criminal activity is afoot." *Id*. at 4–5 (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)). Citing *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020), he defined reasonable suspicion as "more than an inchoate and unparticularized suspicion or hunch but considerably less than preponderance of the evidence." *Id*. at 5 (internal quotation marks omitted).

In his view, the 911 call by SS, together with statements subsequently made by both SS and RS, established reasonable suspicion that crime was afoot. *Id*. Magistrate Judge Dries cited *United v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) for the proposition that a 911 call reporting "very recent criminal activity" justifies a *Terry* stop, "even if the circumstances had changed by the time the officers arrived." *Id*. at 5. He further noted "[a] lower level of corroboration is required before conducting a stop on the basis of an emergency report" and that "non-anonymous 911 calls" as the officers responded to here, "strengthen the complainant's credibility." *Id*. (citing *Williams*, 731 F.3d at 684–685). In Magistrate Judge Dries' view, the officers had corroborated information from the 911 call with the statements

from RS and SS before stopping Johnson. *Id*. Further corroborating the call was, in his view, the surveillance video that was consistent with SS and RS's stories, albeit inconclusive as to the presence of a gun. *Id*. He further noted that RS and SS gave consistent stories and had no apparent reason to lie. *Id*.

### 4.1.2 Johnson's Objections and the Government's Response

Johnson contends that Officers Gonzales and Hayes lacked reasonable suspicion as they approached him that day. ECF No. 24 at 3. Johnson notes that he did not run when they approached and suggests that his "dress" and "demeanor" did not provide reasonable suspicion. *Id*. at 4. He stresses the officers had their own doubts about whether they had enough to pursue Johnson in the first instance, citing the body camera footage showing the officers on the car ride to locate Johnson discussing how they were not sure if the surveillance video shown to them by SS revealed a gun. *Id*. at 3 (citing Exhibit 2A, Officer Gonzales' body camera footage and Exhibit 3A, Officer Hayes' body camera footage). Johnson further suggests that if the officers truly watched the surveillance video, "they would have seen RS shove the much smaller Johnson off the stoop" and "SS leave the store to confront Johnson in an aggressive manner." *Id*. Johnson reaffirms that the officers had only the allegations from SS and RS that Johnson sold drugs and possessed a gun, but that the officers ultimately did not observe drugs or guns, not even in the surveillance video. *Id*. at 4–5. In Johnson's view, therefore, the allegations from SS and RS were not corroborated. *See id*.

In response, the Government argues that by the time Johnson was stopped, officers already had reasonable suspicion crime was afoot. ECF No. 25 at 10. First, the Government points to the 911 call, which was not

anonymous, included a location and described the situation involving a man in a blue jacket making a threat with a gun. *Id*. Second, the Government responds that the 911 call was, in fact, corroborated when Officers Hayes and Gonzales interviewed SS and RS and when they saw the surveillance video, which showed the confrontation. *Id*. To bolster this argument, the Government cites *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) for the proposition that the surveillance video need not conclusively establish the presence of a gun for there to be reasonable suspicion if police, as they did here, find a person matching the person reported to be "involved in a disturbance[] near in time and geographic location to the disturbance." *Id*. at 11. Johnson, the Government suggests, even admitted that he was the one who had a dispute with the store owners once police caught up to him. *Id*. at 10. For this reason, the Government challenges the credibility of Johnson's story, reiterating Magistrate Judge Dries' remark that Johnson's story did not make sense, namely, that he had no idea why police were called but that both sides were "all good." *Id*. at 12 (citing ECF No. 22 at 10). Therefore, the Government argues that there "was no question that Walter Johnson was the alleged gunman," especially given that RS followed him long enough to point him out and that Johnson matched the 911 caller's description. *Id*. at 10. Accordingly, the Government rejects the depiction of Johnson as an individual "randomly stopped by officers while taking a walk." *Id*. at 11.

In his reply brief, Johnson further disputes whether the officers "corroborated" the 911 call by virtue of their interviews with SS and RS. ECF No. 27 at 3–4. Any factual disputes made by Johnson on reply relevant to this analysis have already been addressed in a series of footnotes that the Court need not rehash here. *See supra* notes 2, 8, and 12.

Case 2:25-cr-00095-JPS    Filed 01/07/26    Page 10 of 30    Document 28

### 4.1.3   The Court Agrees with Magistrate Judge Dries

The Court agrees, upon its de novo review, with Magistrate Judge Dries that reasonable suspicion did exist for the *Terry* stop.

#### 4.1.3.1   De Novo Review of *Terry* Stop

To have a basis to conduct a *Terry* stop, the officers must have a reasonable suspicion, which is "more than an inchoate and unparticularized suspicion or 'hunch' but 'considerably less than preponderance of the evidence," that criminal activity is afoot. *Eymann*, 962 F. 3d at 282 (7th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). Analyzing whether reasonable suspicion existed requires assessing the "totality of the circumstances." *United v. Watson*, 900 F.3d 892, 894–95 (7th Cir. 2018) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

Here, the 911 call by SS, coupled with the statements of SS and RS to officers on their arrival, revealed more than a hunch that Johnson was engaged in criminal activity at that time. Even if, as Johnson suggests, the officers had not corroborated the statements of SS and RS, courts "presume the reliability of an emergency 911 call," *United States v. Hopewell*, 498 F. App'x 609, 611 (7th Cir. 2020) (citing *United States v. Drake*, 456 F.3d 771, 774–75 (7th Cir. 2006) and *United States v. Hampton*, 585 F.3d 1033, 1038–39 (7th Cir. 2009)) so long as the call contained "sufficient indicia of reliability." *Gray v. City of Evanston*, No. 23-CV-1931, 2024 WL3495009, at *5 (N.D. Ill. July 22, 2024) (citing *Navarette v. California*, 572 U.S. 393 at 397).

In this case, the 911 call included a statement that a man had pointed a gun at the caller during the incident, which by itself is a possible crime. *See* ECF No. 25 at 17 (citing, among other statutes, Wis. Stat. §§ 947.01, 939.63(1)(b)). The 911 caller also reported the same individual was "walking away," a statement that suggested the situation remained dangerous,

Case 2:25-cr-00095-JPS    Filed 01/07/26    Page 11 of 30    Document 28

warranting an immediate investigation. *United States v. Wooden*, 551 F.3d 647, 750 (7th Cir. 2008) ("[W]hen the police believe that a crime is in progress (or imminent), action on a lesser degree of probability, or with fewer procedural checks in advance, can be reasonable.") (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006)).

Like in *Hopewell*, the 911 caller also "identified himself and gave extra details," such as the caller's location, certain articles of clothing of the suspect, and a statement that Johnson was carrying a weapon. 498 F. App'x at 611. That information, as Magistrate Judge Dries noted, "differentiated [SS] from other anonymous tipsters whose reports may not give rise to reasonable suspicion." *United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009) (citing *United States v. Robinson*, 537 F.3d 798, 802 (7th Cir. 2009) and *Florida v. J.L.*, 529 U.S. 266, 269 (2000)). The video that SS subsequently played to the officers—showing a man matching the description on the 911 call drawing an item from his pocket—further bolstered the truthfulness of that account. *See Drake*, 456 F.3d at 775 (noting that presumed reliability of a call may be overcome if officers learn reason to doubt its accuracy).

That the officers subsequently discussed whether the video conclusively showed a gun does not change the stipulated facts that, as discussed above, both RS and SS reported a man threatening them with a gun and that SS initially placed a 911 call reporting the incident, which raised various possible criminal violations. *See* ECF No. 25 at 17 (collecting possible criminal violations). Moreover, as Magistrate Judge Dries observed, the video, albeit inconclusive as to whether a gun was present, was ultimately consistent with the story given by SS, both on the 911 call and in person, that there was a man making threats toward them just outside their store. That matters because, contrary to Johnson's suggested

approach, officers are not obligated to "rule out the possibility of innocent conduct" before responding to the circumstances confronting them. *Navarette*, 572 U.S. at 403 (2014) (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

Johnson argues that it is "minimally accurate" to say the officers corroborated the 911 call merely because the video they watched did not reveal a gun or drugs. ECF No. 27 at 3–4. Yet, Johnson himself admits that the officers heard "SS restate much of which he had said on the phone," which is exactly the kind of consistency that gives SS's statements their indicia of reliability. *Id*. at 4; *see United States v. Hicks*, 531 F. 3d 555, 560 (7th Cir. 2008) (analyzing whether there was enough for reasonable suspicion given inconsistencies arising out of the 911 caller's description); *see also United States v. Wilkerson*, 411 F.3d 1, 5 (1st Cir. 2005) (noting that "the testimony… bolstered Officer Fleming's credibility generally by restating what had already been said.").

Put differently, Officers Hayes and Gonzales engaged in a kind of "procedural check" by conversing further as to the video's contents than perhaps was necessary given the reported emergency. *Wooden*, 551 F.3d at 750 (citations omitted). While doing so may have led to their own doubts in that moment, it does not, upon this Court's review, betray the kind of doubt that would overcome the reasonable suspicion they had built up from an objective standpoint, which is the only pertinent perspective here. *Wardlow*, 528 U.S. at 673 (reciting that the standard for a Terry stop requires "at least a minimal level of objective justification."); *see also Hicks*, 531 F.3d at 560 (noting that justification for a seizure does not turn on "whether [the officer] knew the truth or whether [the officer] should have known more" (quoting *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007)).

Even when taking the inconclusiveness of the video in Johnson's favor, Johnson does not address the additional facts the officers came upon that corroborated the 911 call. As Magistrate Judge Dries noted, RS had followed Johnson and pointed him out to officers, giving them a description that matched SS's narrative, namely that the person making the threats was a male wearing a blue jacket. To the extent RS also provided a live accounting of Johnson's whereabouts, officers can use otherwise innocent information to develop reasonable suspicion. *See Lenoir*, 328 F.3d at 729 (noting that "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." (citing *United States v. Juvenile TK*, 134 F.3d 899, 904 (8th Cir. 1998)). Indeed, that Johnson happened to be headed home, as opposed to perhaps fleeing the scene, does not sway the Court.[14] *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (noting that driving a minivan with children through a remote part of Arizona may be innocent conduct but that the same conduct could also be consistent with transporting large amounts of drugs, a possible distinction officers need not consider before responding to the circumstances).

Again, as Johnson himself stresses in one of his other arguments, what matters is the "information the police did know at the time of the stop." ECF No. 27 at 3. And, at the time of the stop, Johnson, as explained

---

[14]Notably, Johnson does not suggest that he was outside the expected walking distance from the store considering the time that had elapsed, or otherwise attempt to undermine the reasonableness of the location at which officers encountered him. *See Lenoir*, 328 F.3d at 729; *see also U.S. v. Tilmon*, 19 F.3d 1221, 1225 (1994) (analyzing whether there was a proper stop given the "temporal and geographic gaps" under its facts).

thoroughly above, fit the bill given the information that the officers had to that point. *Hicks*, 531 F.3d at 560.

As such, even assuming Johnson cooperated with police and that Johnson had no suspicious dress or demeanor, the officers already had reasonable suspicion. But in this case, his dress, particularly his blue jacket, matched both SS and RS's description of the suspect, and his demeanor raised questions. As Magistrate Judge Dries noted, Johnson curiously did not know why police were called but, at the same time, admitted to having been in a dispute with the store owner, claiming that both sides were "all good." ECF No. 22 at 10. Johnson vacillates between not remembering the dispute at all and providing pertinent details. Ultimately, Johnson clings to the officers' subjective assessments of the video's contents and the way that he appeared and behaved during the encounter—facts that, even when taken in his favor, overlook the reasonable suspicion officers had otherwise developed here. Thus, the Court will overrule Johnson's objections as to the *Terry* stop because it was lawful.

### 4.2    *Terry* Frisks

#### 4.2.1    Magistrate Judge Dries' Findings as to *Terry* Frisks

According to Magistrate Judge Dries, "[o]nce the officers decided to stop Johnson, the officers were justified in frisking him as well." ECF No. 22 at 5. He stressed that an inquiry, separate from the pat-down, is necessary into whether the frisk was constitutional, namely "whether the police had a reasonable belief that the person was armed and dangerous." ECF No. 22 at 5–6 (citing *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) and quoting *Terry*, 392 U.S. at 27). He found that the officers met this standard as to the first pat-down since they had both SS and RS's statements

that "Johnson, had minutes before, pulled out a gun and pointed it at them." *Id*. at 6.

As to the second pat-down, Magistrate Judge Dries deemed it a "closer call" but determined that it was "ultimately justified by the reasonable belief that the first frisk had missed a weapon." *Id*. He examined whether the officer "had reasonable suspicion to believe that [the suspect], at the moment he frisked him, was a threat to officer safety." *Id*. (citing *Howard*, 729 F.3d at 662). He further referred to the *Howard* case to highlight the "consequences that are serious or worse" when officers miss a concealed weapon and to suggest that officers have legal grounds to pat down again where they "had a credible reason to believe that [another officer] might have missed a dangerous weapon." *Id*. (quoting same). Magistrate Judge Dries found that even though neither frisk revealed a gun, the officers still had the necessary justification given the circumstances here. *Id*. In his view, "this was not a random pat-down due to loitering or shoplifting," but rather a case involving an individual that allegedly pulled a gun just minutes prior to their arrival. *Id*. Given the situation, he found it "understandable" that they "would want to double-check (or even triple-check that the defendant is unarmed," especially when Johnson had on a winter coat. *Id*. at 6–7 (citing *United States v. Johnson*, No. 20-CR-926, 2024 WL 3509623, at *1 (N.D. Ill. July 23, 2024)).

### 4.2.2 Johnson's Objections and the Government's Response

Johnson reiterates the events leading up to the *Terry* stop did not give rise to reasonable suspicion, and, therefore, argues that the frisks that followed were also unlawful. *See* ECF No. 24 at 3–5. Even after being stopped, Johnson notes that he did not flee, "appear impaired, out of breath,

or agitated." *Id*. at 4. Rather, he offered his "complete cooperation," and "fully engaged" with the officers' questions "as to what happened at the store," giving "answers [that] seemed credible." *Id*. at 4–5. Despite his "complete cooperation," Johnson contends the officers unlawfully patted him down for "nearly forty-five seconds."[15] Johnson acknowledges officers had "heard from RS and SS that [he] was an unwanted nuisance who sold drugs near their store and threatened them with a firearm when they confronted Johnson," but points to the lack of "drug transaction or any corroboration of that claim," including the inconclusive surveillance video. *Id*. at 4–5. As to the second frisk, Johnson argues that "if the officers ever had a basis to detain Johnson," it "surely dissipated. . . after that first search," which revealed no gun, because, by then, they knew his information and that "he did not pose any threat." *Id*. at 5.

In response, the Government reiterates Magistrate Judge Dries' finding that there were two witnesses who gave statements that Johnson had a gun that he pointed at them minutes before. ECF No. 25 at 12. As to the second frisk, the Government argues that Johnson overemphasizes the fact the first pat down did not reveal a gun and that he did not flee when officers approached. *Id*. The Government argues that there are consequences when guns are missed and that officers need only establish that the suspect, "at the moment the officer frisked him, was a threat to officer safety" to conduct a second pat-down. *Id*. at 13 (citing *United States v. Smith*, 32 F.4th 638, 642 (7th Cir. 2022)). To this point, the Government, seemingly as further justification for the second pat down, characterizes

---

[15]As noted earlier, *see supra* note 9, this is inaccurate; the pat-down lasted about forty seconds.

Johnson as wearing "layers of clothing including a bulky winter jacket," rendering responding officers uncertain as to whether he had a gun. *Id*. The Government also points out that the second pat-down was done prior to placing Johnson, uncuffed, in the back of the squad car, "directly behind" Officer Hayes. *Id*. Accordingly, the Government argues, in such a situation, it is "understandable" to double or triple check as Magistrate Judge Dries noted. *Id*. at 13–14 (citing ECF No. 22 at 6–7). Lastly, the Government points out that the first *Terry* frisk took approximately thirty-five seconds, and the second one took eight seconds, rendering them both minimally invasive and narrowly tailored. *Id*. (citing *Smith*, 32 F.4th at 642 and ECF No. 15); *see supra notes* 9 and 15.

In reply, Johnson elaborates that the first pat down was "thorough," not "rushed," and covered Johnson's "entire exterior." ECF No. 27 at 4. He also claims that although Johnson "was not pleased about the search," he nonetheless "submitted to it, even calmly answering" the officers' questions during the pat-down. *Id*. Moreover, by telling officers his anticipated plan to go home, Johnson contends that he had "demonstrated cooperation and gave a reason for walking where he was." *Id*. Thus, the officers had "no additional information to corroborate the store owners' claims of gun brandishing" to justify a second pat-down. *Id*. at 5. Johnson concedes a second search may be justified if, among other possibilities, the first search was rushed for some reason, or if new evidence comes to light, such as the suspect's reputation for guns or the discovery of one. *Id*. at 5–6 (citing *United States v. Green*, 946 F.3d 433, 439 (8th Cir. 2019); *United States v. Osbourne*, 326 F.3d 274, 278 (1st Cir. 2003); and *United States v. Rasberry*, 882 F.3d 241, 248–49 (1st Cir. 2018)). However, Johnson suggests that no such justification exists here as to the second pat-down. *Id*. at 5. Finally, Johnson disputes the

Government's characterization that Johnson wore a bulky winter jacket and the suggestion that he had "layers of clothing underneath Johnson's blue jacket" on when searched on the basis that he did not stipulate to those facts. *Id*. at 2–3.[16]

### 4.2.3   The Court Agrees with Magistrate Judge Dries

The Court agrees, upon its de novo review, with Magistrate Judge Dries that reasonable suspicion existed as to both *Terry* frisks. The Court will explain its rationale below.

#### 4.2.3.1   De Novo Review of *Terry* Frisk

To conduct a frisk, officers must have an "objectively reasonable belief that the person was armed and dangerous." *Terry*, 392 U.S. at 27. However, an "officer does not have to be certain that the suspect is armed." *United States v. Colbert*, 54 F.4th 521, 526 (7th Cir. 2022) (citing *United States v. Patton*, 705 F.3d 734, 737–38 (7th Cir. 2013)). The inquiry instead is whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. (citing same). In determining whether a frisk is justified, courts consider the "totality of the circumstances" including "the specific reasonable inferences" an officer is "entitled to draw from the facts in light of his experience." *Id*. (citing *Terry*, 392 at 27 and *Patton*, 705 F.3d at 738). "A follow-up frisk is held to the same standard as an initial frisk," but courts "take account of 'what happened between each frisk' and, of course, the frisk's "proportional invasive[ness]" when assessing reasonableness."

_____

[16]This factual dispute was addressed in an earlier footnote, *see supra* note 8.

*United States v. Avila*, 106 F.4th 684, 697 (7th Cir. 2024) (citing *Smith*, 32 F.4th at 642).

The Court agrees with Magistrate Judge Dries that the two statements from RS and SS that Johnson had pointed a gun at them minutes earlier gave them justification for the first pat-down. *Colbert*, 54 F.4th at 526 (7th Cir. 2022) (citing *Patton*, 705 F.3d at 737–38 (7th Cir. 2013)). Case law does not require that the officers be certain that the suspect is armed, so the inconclusive surveillance video and the officers' subsequent conversation regarding what it showed do not determine the outcome here. *Id.* (citing same). To the contrary, the question is simply whether police "reasonably believed he was armed with *any* weapon, not only with the weapon described in the 911 call." *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007). Upon this Court's de novo review of the store surveillance footage, the video does not rule out a knife or the like, nor does Johnson so argue.

Instead, as Magistrate Judge Dries noted, the totality of the circumstances suggests the opposite: that Johnson was, in fact, armed and dangerous. The stipulated facts here reflect that SS called 911 to report a suspect in a blue jacket making threats with a gun, that RS and SS then provided in-person statements that it was a man in a blue jacket who made the threats, and that RS even physically demonstrated the manner in which Johnson drew the alleged weapon out of his pocket. Moreover, Johnson changed his story from denying he was in a dispute to admitting that he was, giving the officers another reason to be concerned for their safety. *Johnson*, 2024 WL 3509623, at *6 (finding pat-down to be reasonable partly because of defendant's "changing story" as to whether he ever had a disagreement and the corroboration of reports to the contrary). Based on

these facts, the first *Terry* frisk was justified, and the Court will accordingly overrule Johnson's objections here because the first *Terry* frisk was lawful.

As to the second pat-down, Johnson rejects, as noted before, *see supra* note 8, the suggestion that a "bulky" winter jacket or multiple layers of clothing can be the reason that justifies a second pat-down. However, even if the Court resolves Johnson's clothing-related argument in his favor, the officers nonetheless reasonably believed that he was armed and dangerous. Indeed, Johnson cannot overcome the 911 call's reporting, and the subsequent corroboration by SS and RS, as explained above. *Avila*, 106 F. 4th 684 at 687 ("A follow-up frisk is held to the same standard as an initial frisk."). Even if Johnson could overcome these facts, Officer Hayes still had considerable safety concerns to assuage before placing Johnson, unhandcuffed, in the back of the squad car while he ran a background check. *Johnson*, 2024 WL 3509623, at *6 (deciding reasonableness based, in part, on the "evolving circumstances of the police activity"). Notably, Johnson does not argue that the officers had no reason to place him in the vehicle; in fact, he admits their "suspicions were not dispelled such that they should have simply released Johnson." ECF No. 27 at 5 (citation omitted). Indeed, the officers still had the initial reporting that he brandished a gun and made threats, rendering the second frisk entirely appropriate. *Johnson*, 2024 WL 3509623, at *1 (second frisk justified when victim reported boyfriend brandished a gun and threatened to shoot her).

Finally, Johnson argues that the first pat-down "was thorough, wasn't rushed," and "covered his entire exterior." ECF No. 27 at 4. In other words, Johnson suggests that a second *Terry* frisk was unnecessary because the first was thorough. Yet, in the cases Johnson cites, *id*. at 5–6, the courts were considering whether a second, "more thorough patdown" was

reasonable. *Green*, 946 F.3d at 439; *Osbourne*, 326 F.3d at 278 (discussing the reasonableness of a second frisk after a "quick" initial patdown); *Rasberry*, 882 F.3d at 249 (discussing a second frisk where the first one was "restricted" to the suspect's "lower back"). The cases cited, therefore, turn on facts that are exactly the opposite of those here where the time taken on the second frisk was seven or eight seconds compared to the approximately forty seconds that the "thorough" first frisk took. For all these reasons, the second *Terry* frisk was also justified, so the Court will accordingly overrule Johnson's objections here too.

### 4.3    Detention

#### 4.3.1    Magistrate Judge Dries' Findings as to Detention

Magistrate Judge Dries found that Johnson was detained, not arrested, when officers placed him "in the back of the squad car for approximately two minutes," and "then held him sitting on the curb under the watch of the other officers for approximately eight minutes." ECF No. 22 at 7. *Terry*, he recited, allows officers to "briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion." *Id*. (citing *Eymann*, 962 F.3d at 282). Noting that there is "no bright line" between a *Terry* stop and an arrest, Magistrate Judge Dries explained that courts must ask whether the "person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id*. (citing *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) and *Eymann*, 962 F.3d at 286)). He then enumerated various factors to make this determination, including the "officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person

stopped could be said to have been taken into custody." *Id*. (citing *Eymann*, 962 F.3d at 286). He noted "the degree of restraint and duration must be commensurate with the circumstances." *Id*.

Applying this standard, Magistrate Judge Dires found that Johnson was not restrained in a manner equivalent to a formal arrest and that his detention was reasonably related in scope and duration to the circumstances that gave rise to it, namely the 911 call and RS and SS's statements. *Id*. Magistrate Judge Dries first observed that the "officers knew Johnson had been accused of dealing drugs" outside the store, "pointing an item that appeared to be a gun" at the witnesses, and "getting into some degree of public altercation," all about fifteen to twenty minutes prior to their arrival. *Id*. at 8. Each of these might constitute a crime, so the officers, in Magistrate Judge Dries' view, intended to conduct an investigatory stop. *Id*. He also noted that the officers that conducted a brief pat-down and questioned Johnson in a calm and conversational tone, facts which he likened to *Eymann*, where the Seventh Circuit upheld a finding of detention, not an arrest. *Id*. (citing 962 F.3d at 285).

Though the officers placed Johnson in the squad car while waiting for backup to arrive, Magistrate Judge Dries found that doing so did not convert the detention into an arrest. *Id*. He noted that the degree of restraint allowed during a *Terry* stop has expanded over time and that "methods" like that which are "more traditionally associated with an arrest" may also occur during a *Terry* stop. *Id*. (citing *Askew*, 403 F.3d at 507). In his view, placing Johnson in the squad car allowed officers to "promptly" continue the investigation into his background "without leaving him alone with one officer." *Id*. Magistrate Judge Dries also noted that the officers "reduc[ed] the restriction" on Johnson when backup arrived. Overall, he concluded

"this degree of restraint was reasonable" given "the circumstances that justified the stop." *Id*. at 8.

Finally, he cited case law to show the total time spent in detention was not "unreasonably long." *Id*. (citing *Swift*, 220 F.3d at 510 (noting that officers may "maintain[] the status quo while obtaining more information") and *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir. 2021) (collecting cases upholding detentions longer than fifteen minutes)). As such, he found that the degree and duration of restraint were "commensurate to the circumstances" and did not rise to the level of a formal arrest. *Id*.

### 4.3.2 Johnson's Objections and the Government's Response

Johnson objects to Magistrate Judge Dries' determination that it was a detention, not an arrest. ECF No. 24 at 6. According to Johnson, an arrest occurred here because the officers performed two *Terry* pat-downs, questioned him, had two additional officers appear as "a show of force," and placed him in squad car for "disorderly conduct." *Id*. at 6–7 (citing *Eymann*, 962 F.3d at 284). He concedes the officers never told him he was under arrest, but he argues that "any reasonable person would have thought in that situation" that "his freedom of movement was constrained," amounting to an arrest. *Id*. at 6. Because the detention amounted to an arrest, Johnson argues, the officers were required to have probable cause at the time they placed him in the back of their squad car, but did not, rendering the arrest unlawful. *Id*. at 6–7.

In response, the Government argues that Magistrate Judge Dries correctly found that the time in the back of the squad car was not an arrest, but a detention "necessitated by the officers' further investigation, [and] was reasonably related in scope and duration to the 911 call and statements

from RS and SS." ECF No. 25 at 14 (citing ECF No. 22 at 7). The Government points to the two eyewitnesses' reports of "dealing drugs, brandishing a gun, and threatening to kill them" as giving the officers the requisite reasonable suspicion to detain Johnson. *Id*. at 15. It further argues that any "restrictions on Johnson's movement were commensurate with the circumstances." *Id.* (citing ECF No. 22 at 8). Placing Johnson in the car uncuffed for less than two minutes was done while conducting a background check to avoid the risk of leaving Johnson unsecured on the street with only one officer. *Id*. (citing same). Similarly, Johnson's subsequent removal from the vehicle and placement on the curb upon the additional officers' arrivals was done to allow Officers Hayes and Gonzalez to continue their investigation by reinterviewing RS. *Id*. Finally, the Government notes the entire encounter took less than fifteen minutes. *Id*.

Even if the detention morphed into an arrest, the Government's response is that there was probable cause as to "any number of criminal offenses." ECF No. 25 at 15; *see also* ECF No. 25 at 17 (collecting possible criminal offenses). The Government suggests "credible witness statements" can satisfy the probable cause necessary for an arrest, citing *United States v. Davis*, 114 F.4th 500, 505 (7th Cir. 2024), as well as "reasonable conclusions drawn from the facts known to the arresting officer at the time of the arrest." *Id*. at 16 (citing *Reedy*, 989 F.3d at 554). Probable cause, according to the Government, may exist if "the arrestee committed any offense, regardless of the crime charge or the crime the officer thought had been committed." *Id*. (citing *Reedy*, 989 F.3d at 554). Here, the Government argues that when he "was detained, the officers had statements of two first-hand, fully identify victim witnesses alleging that Johnson sold drugs in front of their store, and that he brandished a firearm and threatened to kill them

moments earlier when they told him to leave." *Id*. The Government suggests the witnesses had no reason to call 911 to report drug dealing and a brandished gun unless it was true. *Id*. The Government further points to the surveillance video that was voluntarily provided that was consistent with the 911 call and SS's in-person statements. *Id*. The Government also suggests that the officers knew Johnson was a convicted felon unable to possess a firearm. *Id*. at 16–17. For these reasons, Johnson could have committed any number of offenses. *Id*. at 17 (collecting possible criminal offenses).

In reply, Johnson concedes that, after the first frisk, the "officers' suspicions were not dispelled such that they should have simply released Johnson," but "because the officers had not developed probable cause they should have released Johnson because the stop was about to become unreasonable." ECF No. 27 at 5 (citing *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2014) and *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015)). Since the second search revealed "no evidence" either and "provided no additional reason to detain Johnson," the officers' detention "morphed into an arrest" for which there was no probable cause. *Id*. at 6.

### 4.3.3   The Court Agrees with the Government

The Court agrees, upon its de novo review, with the Government that, assuming the detention morphed into an arrest, there was nonetheless probable cause.[17]

---

[17]Johnson does not object to the finding that there was probable cause by 12:09 p.m., the undisputed time of arrest. Accordingly, the Court applies a no-clear error standard to Magistrate Judge Dries' findings in that respect. Since it detects no clear error in that respect, the Court adopts that part of the R&R.

Case 2:25-cr-00095-JPS     Filed 01/07/26     Page 26 of 30     Document 28

### 4.3.3.1 De Novo Review of Detention

To be sure, the Court here need not review Magistrate Judge Dries' determination Johnson was detained, rather than arrested. Instead, the Court assumes, without deciding, that the detention morphed into an arrest and finds that there was, nonetheless, probable cause. As relevant here, victim-witness statements serve as powerful grounds to justify an arrest, as they "almost always" satisfy the probable cause requirement. *United States v. Davis*, 119 F.4th 500, 506 (7th Cir. 2024). An officer may "normally" find probable cause where he "reasonable believes that the victim is telling the truth." *Id*. (citing *McBridge v. Grice*, 576, F.3d 703, 707 (7th Cir. 2009)). The probable cause analysis is based on the totality of the circumstances, and as the name suggests, it "deal[s] with probabilities." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). In other words, the analysis turns on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. (citing same).

Even before Johnson was placed in squad car, Officers Hayes and Gonzales knew that Johnson had been accused of dealing drugs and engaging in a public altercation in which he reportedly pulled out an item that appeared to be a gun, all about fifteen to twenty minutes prior to their arrival. Those details were corroborated when officers caught up with SS in person and watched the surveillance video, *see supra* Section 4.1.3.1. *See Gates*, 462 U.S. at 214 ("Under the 'totality of the circumstances' analysis, corroboration by details of an informant's tip by independent police work is of significant value" (quoting *Draper v. United States*, 358 U.S. 307 (1959)). That the information was provided by a non-anonymous source with no apparent reason to lie bolsters its credibility. *Williams*, 731 F.3d at 684–685.

Further, when the officers initially caught up to RS, he provided further corroboration that it was a person in a blue jacket that had pulled an item from his pocket that appeared to be a gun and threatened him; RS even provided officers with what he believed to be Johnson's last known direction. They obtained this additional corroboration, even if perhaps it was not necessary. *See id.* (discussing lower level of corroboration required for emergency reports). In any case, by Johnson's own admission, "when the officers stopped [him]," he was reported to police as "an unwanted nuisance who sold drugs near their store and threatened them with a firearm." ECF No. 24 at 4.

Yet, Johnson's objections do not address the probable cause officers had established in connection with any of the other possible crimes he himself acknowledges or that Government otherwise collected in its response brief, ECF No. 25 at 17. *See generally* ECF No. 24 and 27. Instead, Johnson focuses too much on whether the video revealed a gun and whether officers knew he was on any form of supervised release. *See* ECF No. 24 at 17; *see also Reedy*, 989 F.3d at 554 (noting that officers need only probable cause as to any offense, and that that offense need not be the one ultimately charged).

Moreover, Johnson's objections do not directly challenge the credibility of the witnesses' statements.[18] *See generally* ECF No. 24 and 27. Rather, Johnson's objections fire in a more indirect way toward what the officers should have reasonably believed considering Johnson's "calm demeanor," "appropriate[] dress," and "credible" responses to officer

---

[18] Indeed, such an objection would not succeed. As Magistrate Judge Dries later noted, the witnesses here "possessed hallmarks of legitimate victims of a crime who wanted the police to catch the suspect." ECF No. 22 at 11.

questioning. ECF No. 24 at 1, 4. Johnson's responses, however, were not credible as explained before and his dress matched the description of the suspect by all accounts. Johnson, moreover, cites no case law that suggests a suspect's demeanor is dispositive, or at least as weighty as he claims.

Thus, by the time officers initially placed him into the car without handcuffs, the officers already had probable cause to believe that he had committed "any number of criminal offenses." ECF No. 25 at 15; *see also* ECF No. 25 at 17 (collecting possible criminal offenses). The Court accordingly overrules Johnson's objections in this respect.

**5.     CONCLUSION**

The Court agrees with Magistrate Judge Dries' analysis in the R&R, albeit on different grounds, and sees no merit to Johnson's objections. The Court will, therefore, adopt the R&R, ECF No. 22, overrule Johnson's objections, ECF No. 24, and deny the amended motion to suppress, ECF No. 12, and the motion to suppress, ECF No. 11.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Stephen C. Dries' October, 2, 2025's Report and Recommendation, ECF No. 22, be and the same is hereby **ADOPTED**;

**IT IS FURTHER ORDERED** that Defendant Walter C. Johnson's objections thereto, ECF No. 24, be and the same are hereby **OVERRULED**; and

**IT IS FURTHER ORDERED** that Defendant Walter C. Johnson's amended motion to suppress, ECF No. 12, and motion to suppress, ECF No. 11, be and the same are hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 7th day of January, 2026.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge